# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

GARY LEE BENNETT,

                     Plaintiff,

v.

MICHAEL MEISNER, TERRY SAWALL, MICHELLE SMITH, MICHAEL REIGH, ASHLEY FREITAG, DAISY CHASE, ED WALL, and JON LITSCHER,

                     Defendants.

Case No. 15-CV-1097-JPS

**ORDER**

## 1.    INTRODUCTION

The plaintiff Gary Lee Bennett ("Bennett"), a prisoner at Redgranite Correctional Institution ("Redgranite"), brings this lawsuit for the defendants' alleged retaliation against him for filing prison grievances, in violation of the First Amendment. (Docket #16 and #33). This matter was reassigned to this branch of the Court on August 2, 2016. On November 4, 2016, Bennett filed a motion for summary judgment. (Docket #83). On November 7, 2016, the defendants filed their own motions for summary judgment. (Docket #74 and #86).[1] Responses were filed between November 25 and December 5, 2016. (Docket #91, #94, #99, and #102). Replies were submitted between December 8 and December 16, 2016. (Docket #107, #109, and #110). For the reasons explained below, the defendants' motions must be granted and Bennett's motion must be denied.

---

[1] All of the defendants except for Ed Wall ("Wall") are represented by the Wisconsin Department of Justice. Wall has his own private counsel and thus submitted a separate summary judgment motion.

**2. STANDARD OF REVIEW**

Federal Rule of Civil Procedure 56 provides the mechanism for seeking summary judgment. Rule 56 states that the "court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see Boss v. Castro*, 816 F.3d 910, 916 (7th Cir. 2016). A "genuine" dispute of material fact is created when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The Court construes all facts and reasonable inferences in a light most favorable to the non-movant. *Bridge v. New Holland Logansport, Inc.*, 815 F.3d 356, 360 (7th Cir. 2016). Even under this standard, however, the Court "will not draw inferences that are 'supported by only speculation or conjecture.'" *Williams v. Brooks*, 809 F.3d 936, 944 (7th Cir. 2016).

**3. RELEVANT FACTS**

Because the Court will grant the defendants' motions, it presents the facts in a light most favorable to Bennett. The dispositive issues are quite limited, so the Court has constrained its recitation to only the relevant facts where possible. The Court begins with a discussion of the Wisconsin Department of Corrections' ("DOC") prisoner grievance procedures, and then presents a timeline of relevant events.

**3.1    The Inmate Complaint Review System**

The DOC's Inmate Complaint Review System ("ICRS") is an inmate's primary vehicle for submitting grievances about the conditions of their confinement. Wis. Admin. Code DOC § 310.04. It requires that inmates submit formal complaints to the appropriate Inmate Complaint Examiner ("ICE"), not to other prison personnel. *Id.* §§ 310.07(1) and 310.09(6). The ICE

reviews all complaints received for compliance with the procedural requirements of the ICRS. If the complaint appears to be non-compliant, it is returned to the inmate. If the complaint is procedurally valid, the ICE investigates and recommends rejection, acceptance, or other action to the reviewing authority at the prison, which at Redgranite is the warden. *Id.* §§ 310.07(2) and 310.11. The warden, the final decisionmaker within Redgranite, may accept or reject the ICE's recommendation. *Id.* § 310.07(3). The inmate then has a right of appeal to DOC authorities outside of Redgranite, up to the Secretary of the DOC. *Id.* §§ 310.07(6), 310.13, and 310.14.

Bennett and the defendants vigorously dispute one of the procedural requirements applied to Bennett in this case. The Redgranite inmate handbook (the "Handbook") describes a "chain-of-command" ("COC") process, whereby inmates are expected to address complaints with successive tiers of prison personnel prior to filing a formal ICRS complaint. *Id.* If the COC process is not fruitful, the inmate may proceed with the ICRS process. *Id.* Bennett claims that the COC and ICRS processes are inconsistent and that the retaliation in this case stemmed from his attempts to comply with both. *See, e.g.*, (Docket #94 at 3). The defendants maintain that Bennett failed to submit complaints in accordance with either procedure and so his repeated grievances were properly rejected. *See, e.g.*, (Docket #75 at 25-27). The Court need not resolve this dispute, as Bennett's claims fail on other grounds.

### 3.2 Timeline

Bennett is an inmate at Redgranite. Daisy Chase ("Chase") was a "Unit Manager" at Redgranite during the relevant time period.[2] The other defendants besides Ed Wall ("Wall") and Jon Litscher ("Litscher") were security personnel or staff who facilitated the inmate complaint process at Redgranite. Litscher is the current Secretary for the DOC, while Wall is the former secretary.

On March 26, 2015, Chase received an Interview/Information Request from Bennett, also known as a "kite" (and referred to as such hereinafter), written in part on the standard form for such requests and in part on looseleaf. *See* (Docket #77-1 at 13-17, 19). The form itself stated that "I figured I'd provide a rough draft of my ICE to better inform you of where I'm coming from. I'll wait a couple days to submit." *Id.* at 19. The three-and-a-half pages of looseleaf text included with the form detailed Bennett's problems with a Sergeant Murphy, Unit Manager Mueske ("Mueske"), Chase herself, and Bennett's difficulties in utilizing the ICRS and COC systems.

The parties dispute much about the kite. They disagree as to whether the kite contained a threat to file a formal ICRS complaint or an informal COC complaint, or whether the kite was itself a COC complaint. They further dispute the merits of Bennett's complaints mentioned therein. The Court mentions these disputes only to note that in the end, none of them are material.

---

[2]The facts are drawn from the defendants' reply to Bennett's response to their statement of facts unless otherwise noted. (Docket #111). Though such a filing is not contemplated by the Local Rules, Civil L. R. 56(b)(3), the summation is helpful and concise. The Court has not relied on the "reply" statements found therein to the extent they would violate the Local Rules.

Upon receiving the kite, Chase began investigating the claims made therein. She spoke with Mueske and found no evidence to support Bennett's allegations against her. Chase further determined that Bennett had not presented evidence of her own misconduct. Chase thus concluded that Bennett's kite contained false statements about staff.

While Chase's investigation was ongoing, Bennett was placed in "temporary lockup" ("TLU"), which is a housing area separate from the general population. Bennett does not dispute the reasons for this. Inmate lies about staff can damage staff credibility, thereby threatening their ability to enforce rules and maintain security, as well as subjecting that staff member to unwarranted discipline. Complaints based on false statements distract attention from legitimate issues and waste prison resources. Thus, lying about staff is considered a major offense. Inmates suspected of major offenses, like Bennett, are routinely placed in TLU so that prison officials may investigate the issue free from that inmate's attempts to disrupt them, sway witness recollections, destroy evidence, or retaliate against the subject(s) of their offense.

The TLU placement form states that the placement order was issued by a Lieutenant Eichstedt at 12:45 p.m on March 26. (Docket #78-1). This was done, in accordance with the above policies, to ensure that Chase could conduct her investigation without interference from Bennett. Reigh approved Bennett's TLU placement sometime later that day on the ground that he had been accused of a major offense. *See* (Docket #78 at 2-3). Bennett contends that Chase did not read the kite or begin her investigation prior to his TLU placement. Because these issues form the chief basis for his opposition to summary judgment with respect to Chase, the Court addresses them more fully below.

Chase's investigation ended the next day, March 27. At that time, she issued Bennett a conduct report (the "Conduct Report") for lying about prison employees, which is specifically prohibited by the DOC administrative code. Wis. Adm. Code DOC § 303.32. After issuing the Conduct Report, Chase recommended that Bennett be placed in a different housing unit upon release from TLU. She did so to avoid the appearance of retaliation and to "give [Bennett] a fresh start with staff with whom he had not had prior negative interactions." (Docket #111 at ¶ 62).

The remainder of the parties' proffered facts are voluminous but largely irrelevant. The Court nevertheless addresses them briefly to lay a foundation for its analysis. On April 6, 2015, a hearing was held on the Conduct Report. Terry Sawall ("Sawall"), a captain at Redgranite, was the hearing officer. Based on the evidence presented, Sawall determined that Bennett was guilty of lying about an employee as alleged in the Conduct Report. He sentenced Bennett to ninety days of disciplinary segregation. Bennett appealed the sentence to Michael Meisner ("Meisner"), Redgranite's warden, but Meisner affirmed the decision.

Beginning on March 30, 2015, and continuing until June 5, 2015, Bennett filed numerous formal ICRS complaints. Each was addressed by Michelle Smith ("Smith") and Ashley Freitag ("Freitag"), Redgranite's ICE and backup ICE, respectively (both were needed because Bennett's complaints variously accused each of misconduct). The complaints concerned Bennett's TLU placement, the Conduct Report, and the ICRS process itself. All were dismissed or rejected, generally for procedural failings. Though the parties expend much effort debating the merits of each complaint, they are of no moment.

Chase had no further interaction with Bennett after the March 26 TLU placement and March 27 Conduct Report. None of the other defendants had any role in the investigation or issuance of the Conduct Report, and only Reigh and Chase played a part in the TLU placement. The defendants aver that they treated Bennett no differently than any other inmate, and that their actions were not motivated by a desire to deter his grievance-filing activity.

Jon Litscher is the current Secretary of the DOC, and Wall occupied that position during the relevant time period. (Docket #88 at ¶ 1).[3] In May or June 2015 (the precise date is not clear), Bennett sent Wall a letter detailing his retaliation concerns. (Docket #100-1). Although he had general supervisory authority over the DOC, he did not involve himself in day-to-day operations of individual prisons. *Id.* at ¶ 2. In his time as DOC Secretary, he received numerous letters from inmates. *Id.* at ¶ 3. Those were almost always read by his staff, not Wall himself, and forwarded to appropriate DOC personnel for handling. *Id.* As to Bennett, Wall had no involvement in handling his grievances or any other part of the relevant events. (Docket #89 at ¶¶ 8, 10).

4. **ANALYSIS**

   4.1 **Bennett's New Theories**

The Court begins by addressing the nature of Bennett's claims in light of his summary judgment submissions. Upon screening his initial and amended complaints, the Court allowed Bennett to proceed against all of the defendants except Litscher for a claim of retaliation in violation of the First Amendment. (Docket #16 at 4; Docket #33 at 1-3). Bennett was allowed to sue Litscher in his official capacity for the state's grievance-handling policies

---

[3]Bennett does not dispute the facts relating to Wall. (Docket #100).

which allegedly contributed to the retaliation visited upon him. (Docket #33 at 1-3).

In his summary judgment filings, including his own motion and his responses to the defendants' motions, Bennett changes his legal theories in two ways. First, he attempts to establish Wall's liability for implementing constitutionally violative grievance-handling policies. (Docket #83 at 5-6 and #99-1). Any claim involving the promulgation or enforcement of policies is in the nature of an official capacity claim, which Bennett was only permitted to pursue against Litscher and not Wall. (Docket #33 at 3). Thus, Bennett is limited to suing Wall for his personal involvement in any alleged retaliation.[4]

Second, Bennett limits the scope of his claims against the remaining defendants. He asserts that only Chase herself retaliated against him, and that the other defendants "used their respective positions to support Chase's infringement of [Bennett's] constitutional rights (whether through malice or reckless/callous indifference)." (Docket #83 at 2-5; *see* Docket #94 at 1, 7, 11-19; Docket #104 at 2-6).[5] These are different claims from what he was allowed to proceed on at screening, and generally, plaintiffs are not permitted to add additional claims in response to summary judgment. *Messner v. Calderone*, 407 F. App'x 972, 974 (7th Cir. 2011).

---

[4]This issue is the subject of Bennett's "motion to clarify" filed on December 21, 2016, after summary judgment briefing was complete. (Docket #112). The motion is not a proper element of the summary judgment process and will thus be ignored. In any event, Bennett never complained of Judge Randa's screening determination with respect to Litscher and Wall and will not be allowed to do so at this late hour.

[5]On the first page of one of his response brief, Bennett clearly states his position: "Plaintiff alleges that Defendant Chase retaliated against him; Plaintiff alleges that Defendants Reigh, Sawall, Meisner, Smith, and Freitag acted to directly support and suppress Defendant Chase's act of retaliation[.]" (Docket #94 at 1).

Bennett is not adding any claims, however, but rather is altering them. The Court is required to liberally construe *pro se* filings. *Greer v. Bd. of Educ. of City of Chicago, Ill.*, 267 F.3d 723, 727 (7th Cir. 2001). The purpose of liberal construction is to "give a *pro se* plaintiff a break when, although he stumbles on a technicality, his pleading is otherwise understandable." *Id.* (quotation omitted). The instant scenario is not one where Bennett has stumbled on a technicality, or has otherwise inartfully presented his positions, but instead reflects his conscious choice to pursue a particular theory of liability. The Court cannot act as Bennett's advocate; it cannot question or ignore Bennett's decision and insist that he pursue a certain legal theory. *See Perrian v. O'Sullivan*, 1 F.3d 1244, 1993 WL 302224 at *3 (7th Cir. 1993) ("Our duty to liberally construe pro se briefs does not mean we will construe arguments out of thin air."); *Donald v. Cook Cnty. Sheriff's Dept.*, 95 F.3d 548, 555 (7th Cir. 1996). Thus, the Court must address Bennett's retaliation claims in light of his decision to alter them, whether or not the changes aid his cause. *Lewis v. Downey*, 581 F.3d 467, 474-75 (7th Cir. 2009) (court limited its assessment of the *pro se* inmate's claims to the scope of the Eighth Amendment, his chosen theory of liability, though the Fourteenth Amendment would afford him greater protection).

### 4.2   Retaliation

With the above analysis in mind, Bennett's claim against Chase takes center stage. "To survive summary judgment on a First Amendment retaliation claim," the Seventh Circuit holds that Bennett "needed to present evidence from which a reasonable jury could conclude that (1) he engaged in protected First Amendment activity, (2) he suffered a deprivation that would likely deter future First Amendment activity, and (3) the protected activity caused the deprivation." *Harris v. Walls*, 604 F. App'x 518, 521 (7th Cir. 2015).

The defendants concede the first element; non-frivolous inmate grievances are protected by the First Amendment. *Gomez v. Randle*, 680 F.3d 859, 866-67 (7th Cir. 2012).

The Court will further assume that the second element is met. The defendants argue that Bennett's continued grievance filing from March to June 2015 revealed that his protected activity was not deterred. The element is an objective one, however, so Bennett's own actions have little bearing on its resolution. The test is whether "the retaliatory activities would 'deter a person of ordinary firmness' from exercising First Amendment activity in the future." *Bridges v. Gilbert*, 557 F.3d 541, 552 (7th Cir. 2009) (quoting *Bart v. Telford*, 677 F.2d 622, 625 (7th Cir. 1982)). The Court will assume that placement in TLU meets this standard, even though Bennett's grievance filing continued unabated. *See Beamon v. Dittman*, No. 14-CV-136-JPS, 2016 WL 4916809 *14 (E.D. Wis. Sept. 14, 2016). Bennett also believes that issuance of the Conduct Report itself was a deprivation. Though less substantial than TLU placement, the Court will further assume without deciding that the Conduct Report was also a sufficient deprivation.

Bennett cannot establish the third element requiring a causal link between his protected activity and the deprivations visited on him. Bennett asserts that he was placed in TLU because of the March 26, 2015 kite he submitted to Chase. He believes that Chase did not read the kite prior to his placement. He cites one of Chase's discovery responses wherein she states that she cannot remember the precise time she read Bennett's kite. (Docket #68-3 at 142-143). In Bennett's view, Chase's decision to place him in TLU could not have been founded on his alleged lies about staff detailed in the

kite, but was instead based on his mere act of submitting the kite.[6] He describes Chase's conduct as a "knee-jerk reaction" to receiving the kite, "suggest[ing] only a personal, emotional, retaliatory response not in concord with any rational, penological interest." (Docket #94 at 8).

Bennett's line of reasoning fails to appreciate the reason why he was placed in TLU. He was placed there in light of a *pending* investigation of his alleged lying, not because of any confirmed lies. (Docket #78-1). Though she does not give a precise time, Chase affirmatively states that she received the kite prior to Bennett's TLU placement. (Docket #68-3 at 142-143). She further describes her investigation of the kite, which began as soon as she received it. (Docket #77 at 3-5).[7] It was therefore entirely possible for her to have

---

[6]Chase did not actually order the TLU placement: that was done by a Lieutenant Eichstedt. (Docket #68-3 at 143-44). The placement was later approved by Reigh. The Court nevertheless focuses on Chase's role in the TLU placement because Bennett maintains that she was its catalyst. (Docket #94 at 12) ("[Bennett] does not allege that Reigh directly retaliated against him, but that Reigh exhibited reckless/callous indifference and negligence when he permitted [Bennett's TLU placement.]"). In any event, Reigh's approval of the TLU placement was standard practice for an inmate charged with a major offense conduct report. (Docket #78 at 2-3). Aside from his speculation, Bennett offers no genuine basis for a jury to conclude that he was treated differently than any other inmate. Thus, even assuming Bennett pursued an independent retaliation claim against Reigh, it would be defeated by Reigh's non-retaliatory reason for Bennett's TLU placement.

Bennett has additional criticisms for Reigh and other defendants regarding their compliance with the Wisconsin DOC Administrative Code in effecting his TLU placement. This is akin to a due process claim. Bennett was not permitted to proceed on a due process theory and such a claim is also clearly barred by precedent in this Circuit. *Townsend v. Fuchs*, 522 F.3d 765, 770-71 (7th Cir. 2008); *Russ v. Young*, 895 F.2d 1149, 1152-53 (7th Cir. 1989).

[7]Bennett finds it suspect that Chase's discovery response does not specifically mention when she read the kite. *See* (Docket #96 at 3). However, the resulting implication—that she did not read the kite when she received it—is plainly ludicrous. Chase would have had no idea whom to contact to investigate Bennett's kite had she not read it beforehand.

begun her investigation and reached at least an initial determination that the kite concerned lies about staff, thereby supporting the decision to place Bennett in TLU. Bennett also does not genuinely dispute that potential lies about staff are an appropriate basis for TLU placement. (Docket #95 at 8-9).[8] Chase has thus offered a legitimate, non-retaliatory basis for Bennett's TLU placement. *See Hasan v. U.S. Dept. of Labor*, 400 F.3d 1001, 1005 (7th Cir. 2005) (prison authorities not liable for retaliation when punishing prisoner for making a false accusation about staff).

Bennett's other arguments do not undermine Chase's non-retaliatory reason to place him in TLU. First, he believes Chase's retaliatory motive is supported by an e-mail she sent to Brian Miller asking that Bennett not return to her cell block. (Docket #77-2). In light of the rational and uncontested reasons for TLU placement, *see supra* note 8, this e-mail appears to be simply a furtherance of those policies, and was in fact a prudent suggestion to *avoid* any possible perception of retaliation. *See* (Docket #77 at 6-7). Second, Bennett cites a conversation he had with Chase on the morning of March 25, 2015, wherein she asked him to stop writing a request regarding his opinions of staff. This too is conjecture about the "suspicious" timing of a possible motivating event, which the Seventh Circuit routinely rejects as standalone support for a retaliation claim. *Obriecht v. Raemisch*, 565 F. App'x 535, 539 (7th Cir. 2014); *Williams v. Snyder*, 367 F. App'x 679, 682 (7th Cir. 2010) ("[I]n the

---

[8]Bennett complains that he was placed in TLU within hours of submitting the kite, but in light of the undisputed reasons in favor of such placement, the timing of placement actually supports the conclusion that Redgranite's staff took appropriate action. Chase's investigation began immediately, thus necessitating Bennett's quick removal from the general population. If Redgranite staff had instead waited until after Chase's investigation to place Bennett in TLU, that might support an inference of retaliation; such action would be less consistent with the policies underpinning TLU placement.

prison context, suspicious timing is not enough to overcome uncontradicted evidence of other, non-retaliatory motives[.]"). Even assuming the timing of this conversation provided any inference of a retaliatory motive, it does not defeat Chase's undisputed, non-retaliatory reason for TLU placement.

Bennett's claim with regard to the Conduct Report itself fails more simply. His arguments contest the substance of the Report stating that he lied. *See* (Docket #94 at 11). These have no bearing on Chase's decision to issue the Report. Chase states that she issued the report because she determined that Bennett had made false statements about staff. Regardless of the merits of the Report or the findings made at the April 6 disciplinary

hearing, at the time Chase issued the Report, this was a legitimate, non-retaliatory reason for doing so. *See Williams*, 367 F. App'x at 682.[9]

Chase played no further part in the events of this case, and so her liability could only have been based on the TLU placement or issuing the Conduct Report. Bennett cannot establish a causal connection between those activities and any protected activity, and so his retaliation claim against

---

[9]This non-retaliatory motive would also require judgment in the defendants' favor for a slightly different reason. Once an inmate establishes the three *prima facie* elements of a retaliation claim, "the burden shifts to the defendants to rebut the causal inference with evidence showing that they would have taken the same action even without any retaliatory motive." *Antoine v. Ramos*, 497 F. App'x 631, 634 (7th Cir. 2012). Here, the Court finds that the third element, causation, is defeated because Bennett has not offered sufficient evidence to create a jury question as to any allegedly retaliatory basis for his TLU placement and receipt of the Conduct Report. This is primarily due to Chase's unrebutted, non-retaliatory reasons for the placement.

However, even if the Court found that Bennett had established the causation element, this same evidence would carry the defendants' burden to show that the actions would have been taken absent a retaliatory motive. The *Harris* court, addressing an inmate's claim for retaliation due to grievance filing, stated:

> We will also assume that the defendants resented Harris because of his protected activity, but that does not end the matter. For the defendants have furnished uncontradicted evidence that, even if they disapproved of Harris's protected activity, he would have been punished anyway for violating legitimate prison rules that prohibit lying to prison employees and soliciting inmates to join an unauthorized venture. *See Greene v. Doruff*, 660 F.3d 975, 978 (7th Cir. 2011). A prisoner who has evidence that officials were motivated to discipline the prisoner because of protected speech cannot prevail if the officials show, without contradiction, that they would have disciplined him anyway for a legitimate reason. *Id.* In that case, "the improper motive would have done no work, had no effect, left the world unchanged." *Id.*

*Harris*, 604 F. App'x at 521. In Bennett's case, the undisputed evidence shows that Bennett's conduct warranted TLU placement and issuance of the Conduct Report regardless of whether Chase was in any measure driven by personal animus. Her improper motive would have left the world unchanged.

Chase must fail. As noted above, Bennett's theory of liability against the other defendants is that they "supported" Chase's retaliation. (Docket #83 at 2-5; *see* Docket #94 at 1, 7, 11-19; Docket #104 at 2-6). Even assuming this is a valid legal theory, a point on which the Court is not convinced, it cannot survive because there is no underlying retaliation for those defendants to support. *Harper v. Albert*, 400 F.3d 1052, 1064 (7th Cir. 2005); *Fillmore v. Page*, 358 F.3d 496, 506 (7th Cir. 2004) ("Simply put, there was no constitutionally impermissible failure to intervene because there was no violation that compelled intervention.").

The Court makes a separate comment about Wall. Bennett's retaliation claim against him fails for an additional reason. Wall had no role in instituting the retaliatory deprivations, namely the TLU placement and the Conduct Report. Without personal involvement, Wall cannot be liable for a constitutional violation. *Palmer v. Marion Cnty.*, 327 F.3d 588, 593-94 (7th Cir. 2003) ("Because § 1983 does not allow actions against individuals merely for their supervisory role of others,[i]ndividual liability under 42 U.S.C. § 1983 can only be based on a finding that the defendant caused the deprivation at issue. . . . Although direct participation is not necessary, there must at least be a showing that the [defendant] acquiesced in some demonstrable way in the alleged constitutional violation.") (citations and quotations omitted). Wall's only "action" was his non-response to Bennett's letter. Given that Wall rarely read inmate letters, this fact standing alone does not create a triable issue as to Wall's personal involvement in the alleged retaliation. *Johnson v. Snyder*, 444 F.3d 579, 584 (7th Cir. 2006), *overruled on other grounds*, *Hill v. Tangherlini*, 724 F.3d 965, 967 n.1 (7th Cir. 2013).

### 4.3 *Monell* Claim

As noted above, Bennett was allowed to proceed on an official-capacity claim against Litscher. (Docket #33 at 1-3). To succeed on this theory, also known as a *Monell* claim, Bennett must "demonstrat[e] the existence of an official policy, widespread custom, or deliberate act [by Litscher setting a policy]. Further, the plaintiff must show that the official policy or custom was the cause of the alleged constitutional violation—the moving force behind it." *Grieveson v. Anderson*, 538 F.3d 763, 771 (7th Cir. 2008) (citations and quotations omitted). This claim fails at the outset because *Monell* claims are only appropriate where the plaintiff establishes an underlying violation of a constitutional right upon which the policy bears. *Houskins v. Sheahan*, 549 F.3d 480, 493-94 (7th Cir. 2008); *King ex rel. King v. East St. Louis Sch. Dist. 189*, 496 F.3d 812, 817 (7th Cir. 2007) ("It is well established that there can be no municipal liability based on an official policy under *Monell* if the policy did not result in a violation of [the plaintiff's] constitutional rights."). As explained above, none of the other defendants retaliated against Bennett. Litscher, consequently, cannot be liable under *Monell* for implementing a policy which Bennett alleges contributed to that retaliation.

### 5. CONCLUSION

In light of the foregoing, the defendants' motions for summary judgment must be granted and Bennett's denied.[10] The Court will further deny Bennett's motion to clarify. *See supra* note 4. Finally, the pending motion appointment of counsel will be denied as moot. (Docket #103).

Accordingly,

---

[10] Bennett's summary judgment motion might also be denied for its many procedural failings, including the fact that it is unsigned, (Docket #83 at 11), but the Court does not reach those issues.

**IT IS ORDERED** that the defendants' motions for summary judgment (Docket #74 and #86) be and the same are hereby **GRANTED**;

**IT IS FURTHER ORDERED** that the plaintiff's motion for summary judgment (Docket #83) be and the same is hereby **DENIED**;

**IT IS FURTHER ORDERED** that the plaintiff's motion to clarify (Docket #112) be and the same is hereby **DENIED**;

**IT IS FURTHER ORDERED** that the plaintiff's motion for appointment of counsel (Docket #103) be and the same is hereby **DENIED as moot**; and

**IT IS FURTHER ORDERED** that this action be and the same is hereby **DISMISSED with prejudice**.

The Clerk of Court is directed to enter judgment accordingly.

Dated at Milwaukee, Wisconsin, this 17th day of February, 2017.

BY THE COURT:

_____
J.P. Stadtmueller
U.S. District Judge